The next matter on our calendar is Samuel Roberts v. Los Alamos and the University of Rochester. Thanks. Did you tell them to say their names? It doesn't make a difference. Thank you. Good morning. Good morning, your honors. I represent the appellant in this matter and first and foremost the appellant is before this court for a second time regarding the exact same motion below in the district court. The appellant is entitled to summary judgment against Los Alamos on his cause of action for negligence. The elements of a cause of action for negligence are duty, breach of that duty, causation and damages. And Mr. Roberts has proven each of those elements without a genuine issue of fact being raised by either of the defendants. Los Alamos even admits in their third party complaint against the University of Rochester that it entered into a contractual relationship with the University of Rochester for the purpose of using the University of Rochester's laser lab. That it then requested use of that lab and that request was granted by the University of Rochester and that acceptance by the U of R was conditioned on requiring compliance by Los Alamos with the rules and regulations of the U of R relative to safety and the qualification of its equipment. Is there any evidence that Los Alamos didn't follow the rules? Absolutely. Those rules specifically require the principal investigator, Dr. Herman from Los Alamos. Not anyone from the University of Rochester, but Dr. Herman from Los Alamos must prepare a experiment proposal template that lists any diagnostics, any pieces of equipment that he wishes to use that were not yet fully qualified under the University of Rochester rules and regulations. But wasn't the pipe that fell, wasn't that on the list of fully approved diagnostics? No, there is no such list of fully approved diagnostics. It was never listed as fully approved at any point in time. The experimental proposal template that was in fact prepared and filed by Dr. Herman did not include any of the non-qualified diagnostics he wished to use. Which was the non-qualified diagnostics that you're alluding to? Well, certainly the one that caused the accident, the high yield neutron temporal diagnostic or the HYNTD or light pipe it's referred to. Light pipe, right. Okay, so Dr. Herman never discussed the qualification status of the HYNTD with anyone at U of R as he's testified. Let me go back, wasn't the light pipe on the list of approved diagnostics? No, it was on what's called a shot request form list of diagnostics. The rules are crystal clear. The rules state that non-qualified diagnostics generally do not appear on that list. So it was the absence of it. Was it on the list though? It was on the list. Allegedly it was on the list. Therefore it wasn't absent from the list, so we have to assume it was approved, right? No, no. If non-approved diagnostics generally do not appear on the list, the word generally means that sometimes they do. Okay, usually they don't, sometimes they do. Numerous witnesses have testified to this fact. Mr. Lux, the person who wrote the rules, testified the word generally is a caveat in that sentence. Dr. Gleboff, the individual who brought the light pipe through the qualification process, confirmed that the word generally means usually sometimes there are exceptions, his words, exceptions to that. What would you have had Los Alamos do when the doctor proceeds with his experiment? What should they have done that they didn't do? They are to do exactly what they're tasked to do under the rules. And that is to inquire as to which one of the diagnostics that they wish to use, whether they are qualified or not qualified. They were on the list, you just told me they were on the list. But the list does not mean they're qualified. He couldn't accept the list as being dispositive. That's right. And that was where he failed in his duty to Mr. Roberts. Well, his defense of reasonable reliance on that list fails because the list is not a list of qualified diagnostics, all right? So that defense of reasonable reliance fails because the list simply isn't what he says it is. And none of the U of R doctors say it is, and as a matter of fact, they say it is not. Dr. Meyerhofer also testified that when looking at that rule, the rule does not state that anything that's on that list is qualified. It does not mean that. So Dr. Meyerhofer from the University of Rochester, the director of the experimental division itself, said that he understood that to be the case. So if the list is not a list of qualified diagnostics, all right, then it cannot be relied upon as such. Now, 13 days after the accident, there was an incident report prepared and signed by the University of Rochester. This is Judge Winter in New Haven. When you talk about this list, was the list in evidence before our previous ruling? No, it was not, Your Honor, and there is no specific list printed out. There's some evidence in the record as to whether or not at what point in time the HYNTD would have appeared on the SRF. There's one listing that was existing in the original record that showed it was not on the list. There's later evidence to indicate it may have been on the list. However, there was an email sent by Dr. Herman to Dr. Gleboff, asking him to add it to the list prior to the accident. So my guess is it was added around that time. But again, it's only relevant if the list is a list of qualified diagnostics, which it is not. Okay, thank you. So are you saying that Dr. Herman or any other scientist reasonably has to independently verify that each piece of equipment, and I think some 20 pieces of equipment were used here, had been qualified according to the proper procedure? Absolutely. As a matter of fact, Dr. Herman himself testified as to the meaning for the rule and why he's asked to identify non-qualified diagnostics. And Dr. Herman said, that means if you're planning to run a diagnostic that hasn't completed the qualification process, that you have to spell that out so that the LLE staff knows that that particular diagnostic needs to complete its qualification process at least two weeks prior to the shot day. So again, if myself as experimental PI, if I were planning on using a diagnostic that had not been qualified at least two months prior to the experiment, this would be the way of making the staff at LLE aware through the template that the diagnostic needs to be qualified at least two weeks prior to the experiment in order to be used. Why should he have known that it wasn't qualified? It's his obligation, and if he knows it's his obligation, then he must inquire and he must determine whether or not it's qualified, since he is the last line of defense. The University of Rochester clearly should have known whether or not their diagnostic was or was not qualified. However, their rules are structured in a way to provide one last line of defense. If an experimental PI, even if it comes from an outside lab, wishes to use that piece of equipment, they have to identify whether or not it is fully qualified. Of what use is the rule to require Los Alamos to identify non-qualified diagnostics if they were not required to inquire at all? Now- What does he have to do besides looking at a list of qualified diagnostics? There was no such list of qualified diagnostics. If there was a list of qualified diagnostics, and it didn't say that non-qualified diagnostics are generally not on that list. If it said non-qualified diagnostics are not on that list, you would have an argument. All right, or the respondents would have an argument. But that's not what the rules say. The rules are crystal clear. They warn him as a PI that sometimes non-qualified diagnostics appear on that list. The incident report I mentioned found 13 days after this accident, 17 diagnostics that were on that list that were not fully qualified. 17, including the high yield neutron temporal diagnostic. It was common practice for the U of R to place diagnostics on the shot request form, even though they were not qualified. As a matter of fact, in the qualification process, there's a line item for adding a diagnostic to the shot request form before the line item for final qualification and approval for operation. So even in the qualification process, the University of Rochester anticipated adding the diagnostic to the shot request form list before it was finally approved for operation. Adding it to that list has nothing to do with whether or not it is qualified. It is a step along the way to obtain this qualification. And they finished that step, but they did not finish the remaining steps that required engineering review of how it was installed, engineering review of the pressure system, the pressure relief valve, and the pressure regulator. There was no pressure relief valve. The pressure regulator was for an air system, not rated for the CO2 bottle it was attached to. Any engineer who was put through that process to review that installation and use the fit and function test required by their qualification process would have recognized these problems, would have corrected them prior to use, at least two weeks prior to use, and this accident would have never happened. So we have a clear causation because of Los Alamos' failure to even inquire. They admit they didn't inquire, never discussed it with anybody at U of R, didn't review the qualification checklist, it did nothing at all to satisfy their duty to list all non-qualified diagnostics on that experiment proposal template. But this was not a new piece of equipment, right? It had been used in the lab before, and it was available for selection on the shop request form, correct? Whether it was a new piece of equipment, any new piece of equipment must be qualified at least two weeks prior to use, okay? When this was new, two years prior to this accident, it had not yet completed its qualification, all right? So as a new piece of equipment two years prior to this accident, it must be fully qualified. Since it never was, since it was never fully qualified, that process wasn't complete. There was a qualification meeting. How could he have known that? How can who have known? Dr. Herman. He could have asked. He could have looked at the qualification checklist, which he's been trained to know about. And because he's been trained on the qualification process, since Los Alamos themselves have brought their own diagnostics through that process and used those qualification checklists themselves for their own diagnostics. So he knows very well. All he has to do is look at the checklist. If it's completed, if it has the nine signatures from all the individuals required to approve it for operation, then he knows. He can simply ask, but he did not ask because he admits that. He did not inquire, and he admits he never discussed his qualification status. It was still in process. There was a qualification meeting scheduled for the day after this accident. It had not completed the qualification process yet. The mistake was beginning to use the diagnostic for two years before that qualification process. Now, Mr. Louks has testified that if this were brought to him, he would have never signed off. So we know that if this was raised, one of the required signatories would never have signed. We know that because that's what he testified to. It would never, and he said, I would have never allowed it to be used if I knew. Well, there we have it. If he brought it to the attention of the people in the University of Rochester, as he testified, so the LLE staff can finish that qualification before use, the accident would have never occurred. So they cannot be successful on listing on the SRF simply because the rules advise him. Generally, that's true, but not always. Sometimes there's exceptions to that. Counsel, your time has expired. You're reserved two minutes for rebuttal. We'll hear from Los Alamos first, and then the University of Rochester. Good morning. Good morning. May it please the court. My name is Greta Colson from Winslow, Vietnam, and I represent Los Alamos National Security. And I appreciate the court's initial question as to whether there's evidence that Los Alamos did not follow the rules of the University of Rochester. And I'd like to just address that right off the bat. What rules we're talking about is absolutely crucial here. Rules for the University of Rochester's internal staff, their internal building operation and use of the facility that certainly Mr. Roberts was required to comply with, and as well as everyone else at the U of R, are one thing. The rules that they gave visitors, visiting scientists, is a whole different thing. If a visiting scientist wanted to bring in a piece of equipment, all of that testimony that my opposing counsel just read about the qualification process, Los Alamos would have had to qualify its own equipment. But no equipment of Los Alamos injured Mr. Roberts here. That's not what happened. What happened is permanently installed equipment in the lab that was put on a menu. The shot request form has been referred to in the testimony as a menu. And the menu's given to outside scientists and say, hey, does any of this equipment something that might be helpful to your experiment, and they could check off the boxes. The outside scientist received a representation from the University of Rochester that the equipment was qualified. And they were given a limited review of the sort of the high flyover rules. If it's qualified, you can use it. If it's not qualified- Why were they told that it was qualified? They were told in training that if it was on the shot request, they could use it when they first got their introduction to what the lab did. And they were told by having it on the shot form, and that was the understanding. Every witness consistently testified to that. There's not a single witness who says that the practical reality of it was any different, despite counsel's argument. They just told us that Los Alamos had an additional duty to make sure that what was on the list was really qualified. And how could they? If they said, hey, are you following your own rules, University of Rochester? Are you really doing a good job? That would have been out of context, and the U of R would likely have said, of course. Why would Los Alamos have had a duty to go behind the curtain? This is Ted Winther in New Haven. Your argument is a critique of our previous summary order. Everything you're saying applies to that order. What evidence do you have that contradicts our earlier statement? And I mean evidence, not legal argument. Our earlier statement that there was a material dispute of fact over whether the machine was qualified. And, Dr. Herman, that there was a material dispute of fact over whether Dr. Herman had a duty to inquire as to whether it was qualified. The additional evidence since the previous order includes a number of things. Including the cooperative agreement, which is the overarching contract that allocates the responsibility for safety and qualification and insurance and everything else. We didn't have that available because Los Alamos was not a party to that agreement. That agreement was between the Department of Defense and the University of Rochester. So that was not part of the record and that is a crucial document that allocates specifically who's responsible. So that's one issue we didn't have. Another piece of evidence we didn't have are all of the deposition transcripts that we have completed since. Wherein the University of Rochester admits we didn't do this properly, but we represented by putting it on that menu, that shot request form, that it was qualified. We might have done a terrible job and we didn't do everything we should have done behind the curtain. But to the outside scientist, we represented it was qualified. So as it relates to Los Alamos, Los Alamos had no way of going behind the curtain. They had no right of control, no right to all of the internal documentation that the University of Rochester had on their equipment. They didn't design it, they didn't build it, they had no physical access to it. And in fact, they were not even in physical proximity to this machine. They couldn't see it. My client, Los Alamos' principal investigator, Dr. Herman, was in a conference room receiving a data stream passively on his computer. He was not the last line of defense. The last line of defense was the University of Rochester that approved the experiment. The last line of defense was the University of Rochester who operated the machinery. The last line of defense was Dr. Gleboff, who was supposed to make sure Mr. Roberts understood how to operate that equipment. The last line of defense was Dr. Gleboff when he instructed Dr. Roberts to operate the equipment, not having confirmed that it was secured to the rafters properly, that it was going to operate properly, that it wasn't going to explode when the pressure dial was turned. Dr. Gleboff is the one who ordered the shot. Dr. Gleboff is the one that controlled everything. My client was in a conference room, not even within the ability to view what was going on. My client was not the last line of defense on this. It was the University of Rochester, and it's a horrible, horrible workplace accident that is firmly falling inside of New York state workers' compensation law. So there is no, and you know, Mr. Roberts testified in this case as well. He doesn't allege that Dr. Herman or anyone from Los Alamos had any control over this piece of equipment, ever operated this equipment, or had any right of control over him. So there is absolutely no testimony. We hadn't completed any of those depositions to have that information at the time the last, the last time we came at a very early stage before discovery, and we also didn't have the shot request form. There was a number of document discovery issues in this case. Again, Los Alamos doesn't control the lab or the computers at the lab, the University of Rochester does. So we had to get in discovery all this information about the shot request form, the menu that our client was given. We didn't have the full set of regulations that the University of Rochester applies internally, because they don't apply to my client. We had to get all of that information in discovery to be able to come back to you and say, there's a reason we didn't have all of this information about the qualification process, about the history, about the installation of this product, it's because it wasn't our product. And we had nothing to do with the design, the installation, the development, the use, the operation. No physical control. And here we are, still talking about false crafts since 1928 about what is the scope of foreseeability and risk. And even in the quote that plaintiff's counsel pulls out in his brief, the word relation is key to that decision. There has to be a sufficient relation between the person that's claimed to owe the duty and the plaintiff to give rise to that duty. And in this case, it just isn't here. Thank you, counsel. We'll hear from the University of Rochester. Good morning, may it please the court. My name is Bill Linen, I'm here on behalf of the third party defendant, University of Rochester. I'd like to start with the LLE's rules and regulations. And the primary rule that plaintiff is contending that Los Alamos violated was the duty to identify any non-qualified diagnostics on an experimental proposal form. Is it your position that Los Alamos had a duty to do more than they did? No, absolutely not. Los Alamos had an obligation to follow the university's rules. The rule in effect here is a two prong rule that requires both prongs before it's in place. Both counsel have argued here this morning on this case seems to put the blame on the University of Rochester. Is that correct? That's absolutely correct. And that's consistent with the summary order in this case, which previously explained that the bulk of the responsibility fell on the University of Rochester. And due to the workers' compensation bar, the University of Rochester is not a viable defendant. But more importantly, it reflects the fact that the University of Rochester had a strict set of controls over its facility. It did that for a very specific reason. This facility has highly scientific, highly technical, and very dangerous- How did the pipe fall on Mr. Roberts? Well, the accident was unwitnessed, but subsequent investigation revealed that three bolts were mis-sized when installed in 2006. The designs called for half inch bolts. What was actually installed were quarter inch bolts. And whose responsibility was it to install the pipe correctly? In 2005 and 2006, the university designed and installed the light pipe. It used it for over 60 shots. It took it through a qualification process. It considered it a qualified diagnostic at the time Dr. Herman selected it from the shot request form before the August 6, 2008 accident. The university installed it. There is no dispute that Los Alamos had no role in the design, the installation, or the prior use of the light pipe before- So the University of Rochester mis-installed this pipe when it was first installed? Are you telling us that, that they did install it in error with the wrong size nuts and bolts? After the accident occurred, there was a retrospective review of the qualification process and of the bolts that were installed. And it was determined that the incorrect size bolts were installed initially by the University of Rochester. Those were sheared during the accident, causing the light pipe to fall on plaintiff. However, the review also was a hindsight based review. Up until the accident, the HYNT was on the available shot request form that was, that the witnesses have testified universally contained only qualified diagnostics. In fact, plaintiff himself at his deposition testified that when a diagnostic completes the qualification process, it gets added to the shot request form. The only, plaintiff's only argument that unqualified diagnostics appear on that list is completely hindsight and is based entirely on the post-incident report. And it addresses nothing about what Dr. Herman expected when he relied on the university representation that the HYNT was qualified because it was on the shot request form. In fact, the shot request form is the only mechanism that an external or an internal principal investigator can use to verify that a diagnostic had completed qualification. So it was qualified at the time Dr., the principal investigator wanted to use it. It was qualified by the University of Rochester, is that correct? That's correct, it was qualified by the University of Rochester. They had no duty, you argue before us, as previous council did, to look beyond, to look behind the list. Even though opposing council told us that it says it's generally acceptable. They had no duty to make sure that it was absolutely qualified, right? Not only did they not have a duty to do so, they did not have the ability to do so. The testimony is consistent in this case that the way the University of Rochester conveys to both internal and external principal investigators that a diagnostic is qualified and available for use is a shot request form. There is testimony that if a principal investigator wanted to look beyond that list, as plaintiff suggests, he or she had to contact the diagnostic principal investigator who developed a particular diagnostic. And in fact, that's exactly what happened in this case before the accident. There are emails that show that Dr. Herman emailed and requested Dr. Gleboff to configure the light pipe before the accident occurred for use during the experiment. Dr. Gleboff was the one who qualified it. There's no question that he knew it was a qualified diagnostic. So even if you adopt plaintiff's position, it still would not have prevented the accident, which is a key issue in terms of determining whether a defendant owes a duty that was identified by this court in its summary order. Preventable, given the fact that it was misinstalled years before. This was the time that it was just going to fail. Is that your argument? Is that what you're telling us? The accident was unwitnessed. What has been learned subsequently was that there was an over pressurization of the light pipe, which caused it to dislodge from its bolts. The danger of that occurring has existed since the university installed it, with no roll whatsoever from Los Alamos. The danger had been there since the installation date, and while tragic, that danger existed at that time. Indeed, Mr. Roberts suffered tragic, grievous injuries. Isn't that correct? There's no denying that, Your Honor. Unfortunately, the workers' compensation bar prevents the university, the party that exerted control over both the device, the experiment, the facility, and plaintiff himself, as an employee. It prevents the university from being a viable defendant. And the New York State Court of Appeals has taught that despite sympathetic facts, the gambit of a duty must be limited to a controllable degree. And that's consistent with this court's summary order in 2014, which established that the party that should owe a duty to Mr. Roberts is the party that could have prevented the harm. In that case, that is unquestionably the university. I'm familiar with that summary order. I believe you are, Your Honor. Very well. If nothing else, I'll concede the rest of my time. Thank you, Your Honor.  Counsel, you have two minutes. Thank you, Your Honors. Two things strike me as almost unbelievable at this stage in this litigation. One is the representation to this court that the rules that I'm referring to do not apply to Los Alamos. Nothing could be further from the truth. The rules are at section 1004, and they are entitled Experimental Proposal and Principal Investigator Roles and Responsibilities. These are the rules for the principal investigators who are the individuals responsible for proposing experiments on the laser. In this case, everyone has testified that that was Dr. Hans Herman from Los Alamos. This was not Dr. Gleboff's experiment. This was Los Alamos' experiment, a part of the DT ratio series of experiment they've been conducting over a number of years. They've all admitted that. To say that these rules did not apply directly to Los Alamos in that role is a false statement, and I cannot believe it's being made at this stage. And that's the section that includes the requirement that he identify non-qualified diagnostics and list them on his experimental proposal template, which he did not do, which is a breach. Secondly, the University of Rochester just told this court that the HYNTD, the light pipe, was fully qualified. That is absolutely untrue. There's no evidence of it ever being fully qualified, ever. They may want to say we considered it to be fully qualified even though we didn't. It was never fully qualified. The University of Rochester itself, 13 days after this accident concluded, this accident was caused by the failure to fully qualify the HYNTD. That's their conclusion, that that's what caused this very accident. So to say that before this court, that it was at any time fully qualified, I cannot believe it. And that is shocking to me, it is absolutely untrue. The cooperative agreement cited by counsel has no bearing on this case. Los Alamos was not a party to it. It does not bind Los Alamos. Thank you. Thank you all, very well argued. We will reserve decision.